**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JEROME MCNEAL, DONETTA MCNEAL,** | ) |
| **and JAMARI MCNEAL, a minor,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) **Case No. 09-C-1500** |
| **v.** | ) |
| | ) |
| **CHICAGO POLICE OFFICERS ANTHONY** | ) |
| **P. BRUNO, STAR NO. 12212, FREDI** | ) **Magistrate Judge Jeffrey Cole** |
| **BARROSO, STAR NO. 16309, A. JANIK,** | ) |
| **STAR NO. 10860, D. SHARP, STAR NO.** | ) |
| **12950, and E. SLEDGE, STAR NO. 15645,** | ) |
| **Individually and as Employees/Agents of the** | ) |
| **City of Chicago** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

Jerome McNeal Sr., his wife, Donetta McNeal, and their minor son, Jamari McNeal, are suing Chicago Police Officers Anthony Bruno, Fredi Barroso, Andrew Janik, David Sharp, and Eugene Sledge under 42 U.S.C. § 1983 and various state law theories for alleged violations of their constitutional rights that occurred during an arrest and search at the McNeals' home on March 17, 2008. Three of the defendants, Officers Janik, Sledge, and Sharp, have moved for summary judgment.

## I.

### A.
### The Standard For Summary Judgment Under Rule 56

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material

if it is critical to the determination of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Spivey v. Adaptive Marketing LLC*, 622 F.3d 816, 822 (7th Cir. 2010). A genuine issue of material fact exists, precluding summary judgment, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Once a properly supported motion for summary judgment is made, the opposing party must respond by setting forth specific facts showing that there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 255. In considering a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999). But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts. ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue' for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).

**B.**
**Local Rule 56.1**

For summary judgment purposes, the relevant background facts are derived from the parties' Local Rule 56.1 submissions. The rule requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the...party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643 (7th Cir. 2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc.,* 423 F.3d 627, 633 (7th Cir. 2005). The party opposing summary judgment must then respond to the movant's statement of proposed

material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009); *Bay Area Business Council, Inc.,* 423 F.3d at 633, and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." Local Rule 56.1(b) (3)(C); *Ciomber,* 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009); *Bay Area Business Council, Inc.,* 423 F.3d at 633.

If the moving party fails to comply with the rule, the motion can be denied without further consideration. Local Rule 56.1(a)(3); *Smith v. Lamz,* 321 F.3d 680, 682 n. 1 (7th Cir. 2003). If the responding parting fails to comply, its additional facts may be ignored, and the properly supported facts asserted in the moving party's submission are deemed admitted. Local Rule 56.1(b)(3)(C); *Montano v. City of Chicago,* 535 F.3d 558, 569 (7th Cir. 2008); *Cracco,* 559 F.3d at 632; *Cady v. Sheahan,* 467 F.3d 1057, 1061 (7th Cir. 2006). District courts are "'entitled to expect strict compliance'" with Rule 56.1, and they do not abuse their discretion when they opt to disregard facts presented in a manner that does follow the rule's instructions. *Cracco,* 559 F.3d at 632; *Ciomber,* 527 F.3d at 643; *Ammons v. Aramark Unif. Servs., Inc.,* 368 F.3d 809, 817 (7th Cir. 2004). The court is not required to hunt for evidence in the record that supports a party's case if a party fails to point it out. *Roger Whitmore's Automotive Services, Inc. v. Lake County,* 424 F.3d 659, 664 n.2 (7th Cir. 2005); *Bay Area Business Council,* 423 F.3d at 633 (court properly disregarded affidavits not referred to in 56.1 submission).

## C.
## Factual Background

On March 17, 2008, Officers Bruno, Barroso, and Janik were on a routine patrol in the area of 7007 S. Clyde, Chicago, Illinois, gathering information regarding the robbery of an off-duty police officer that had occurred the week prior. (Defendants' Local Rule 56.1 Statement of Facts ("Defs. St.") ¶ 4, 5; Plaintiffs' Response to Defs. St. ("Pls. Rsp.") ¶ 4, 5). The officers observed an individual, later identified as Damien Stewart, and two others on the back ground-floor porch of 7007 S. Clyde, smoking what the officers believed to be marijuana. (Defs. St. ¶ 6; Pls. Rsp. ¶ 6).[1]

From here on out, the facts are mostly in dispute. We begin with the officers' version of what happened: As the officers approached in order to question the individuals on the back porch, Stewart fled, running up an outdoor staircase leading to the porch of the plaintiffs' third-floor apartment. (Defs. St. ¶ 7-8). Officers Bruno and Barroso pursued Stewart, while Officer Janik drove the squad car around to the front of the house in case Stewart attempted to make an escape through the front. (Defs. St. ¶ 8-9).

Stewart entered the plaintiffs' apartment through the porch door, followed closely by Officer Barroso. (Defs. St. ¶ 10). Officer Barroso caught up to Mr. Stewart in the kitchen of the apartment and took him into custody. (Defs. St. ¶ 11). Jerome McNeal Sr. was on his computer in another room of the apartment at the time. (Defendants' Response to Plaintiffs' Statement of Additional Facts ("Defs. Rsp.") ¶ 3). Hearing noises in the kitchen, Mr. McNeal stepped out of the computer room and walked past his 14 year old son, Jamari, who was on the couch in the living room taking asthma medication through a nebulizer. (Defs. Rsp. ¶ 4).

---

[1] Stewart denied he was smoking marijuana, although he did admit to possessing it at the time of the incident. (Defs. St. ¶ 6; Pls. Rsp. ¶ 6). The officers later recovered the drugs from Stewart's person. (Defs. St. ¶ 12; Pls. Rsp. ¶ 12).

By this time, Officer Bruno, who was lagging slightly behind Officer Barroso and Mr. Stewart, had reached the third-floor porch and attempted to enter the apartment. (Defs. St. ¶ 13). Mr. McNeal, who had entered the kitchen, now stood in the doorway to the apartment, blocking Officer Bruno's entry. (Defs. St. ¶ 13-14). After being verbally ordered to move, Mr. McNeal continued to stand in the doorway in a manner that prevented Officer Bruno from entering. (Defs. St. ¶ 15). Officer Bruno then attempted to place Mr. McNeal under arrest for obstruction. (Defs. St. ¶ 15).

According to the officers, Mr. McNeal resisted arrest, requiring Officer Bruno to use an "emergency takedown and cuffing technique." (Defs. St. ¶ 16). As Mr. McNeal continued to resist, both officers fell to the floor and began to "tussle" with him. (Defs. St. ¶ 16-17). While on the ground, the defendants say that Mr. McNeal attempted to punch and kick Officer Bruno before the officers were finally able to handcuff him. (Defs. St. ¶ 18, 26). At some point during the struggle, Donetta McNeal and Jamari had entered the kitchen, and the officers had instructed them to "step back out onto the porch for officer safety." (Defs. Ex. 3 – Bruno Dep. at 44).

In the meantime, having seen no one escape out the front of the house, Officer Janik drove back to the alley and went up to the apartment. (Defs. St. ¶ 9). When he reached the plaintiffs' back porch, Ms. McNeal and Jamari were standing outside. (Defs. Ex. 2 – Janik Dep. at 23). According to the officers, neither Ms. McNeal nor Jamari were ever handcuffed. (Defs. St. ¶ 49).

At around the same time, Officers David Sharp and Eugene Sledge, who had been called in to assist the other officers, arrived in a separate squad car and proceeded up to the third-floor. By the time Janik, Sharp, and Sledge entered the apartment, both Stewart and Mr. McNeal were already

handcuffed and in custody. (Defs. St. ¶ 27-28). Officer Sharp was in the kitchen for only a few minutes, and Officer Sledge remained in the doorway providing security. (Defs. St. ¶ 29).

While in custody in the kitchen, Mr. McNeal, in response to a question whether he was on "papers" (*i.e.* parole), told Officers Bruno and Barroso that he was. (Defs. St. ¶30; Ex. 3 – Bruno Dep. at 52). In response to further questioning, whether he had anything illegal in his apartment, he said that "all I got is a banger because them Four Corners keep fucking with my son." (Defs. St. ¶ 32; Ex. 3 – Bruno Dep. at 54). Officer Bruno and/or Officer Barroso had already "searched the immediate area" and found nothing. There then followed a search by Barroso that produced a gun either from between two mattresses in the bedroom, or between the mattress and the box spring, and Mr. McNeal acknowledged that the gun was his. (Defs. St. ¶ 33; Ex. 3 – Bruno Dep. at 54-55). Mr. McNeal made no complaint about any injuries he may have suffered from the incident. (Defs. St. ¶ 38). After the gun was recovered, Mr. Stewart and Mr. McNeal were taken down and placed into squad cars and transported to the police station. (Defs. Ex. 3 – Bruno Dep. at 57).

The plaintiffs have a starkly different version of events, which begins with Mr. McNeal stepping out of the computer room after having heard noises in the kitchen as a result of the scuffle between Officer Barroso and Stewart. (Plaintiffs' Statement of Additional Facts ("Pls. St.") ¶ 3). According to the plaintiffs, when Mr. McNeal entered the kitchen, he observed Officer Barroso taking Stewart outside the apartment onto the back porch. (Pls. St. ¶ 4). After handcuffing Stewart to the porch banister, Officer Barroso then attempted to re-enter the apartment. (Pls. St. ¶ 7; Pls. Rsp. ¶ 13). Mr. McNeal asked if Officer Barroso had a search warrant and why he was trying to come back into the apartment. (Pls. St. ¶ 10). Ms. McNeal, who was in her bedroom at the time, joined her husband at the porch door to ask the police what was going on. (Pls. St. ¶ 5). Mr.

6

McNeal testified that although he stood in the doorway, he was not actually physically "blocking" the officers' re-entry in any way. (Pls. St. ¶ 9; Defs. Ex. 6 – McNeal Dep. at 40-42).

Officer Barroso then pulled Mr. McNeal out onto the porch, throwing him down and stomping on his right knee. (Pls. St. ¶ 11). This caused Mr. McNeal to scream out in pain, although he "did not formally complain of any injury" to the officers afterwards. (Pls. Rsp. ¶ 38). Officer Bruno then got on top of Mr. McNeal, who said he was struck in the head by an unknown blunt instrument. (Pls. St. ¶ 11). Mr. McNeal said that he did not resist arrest. (Pls. Rsp. ¶ 16). The officers then cuffed Mr. McNeal to the porch banister and ordered Ms. McNeal and Jamari to come out onto the porch. (Pls. St. ¶¶ 13-14). Jamari, who said he had observed the incident from the living room couch while continuing to take his asthma medication through a nebulizer, was told by Officer Barroso to stop using the machine and to stand on the porch. (Pls. St. ¶ 15).

Officer Barroso then handcuffed Jamari to Ms. McNeal on the porch. (Pls. St. ¶ 17). Because Jamari was sick and was wearing only shorts, a white tank top and socks, Ms. McNeal asked whether he could get some clothes or stay inside. (Pls. St. ¶ 18). That request was denied. In response to Ms. McNeal's threat to report the officers to the Office of Professional Standards ("OPS"), Officer Barroso told her that if she did not "shut the fuck up," he would "drag her ass to jail." (Pls. St. ¶ 20).

The plaintiffs' Rule 56 statement does not include or implicate Officers Janik, Sharp, and Sledge in these events. Yet, without that participation, the plaintiffs' claims against them stand on a very different footing than if they were participants or observed the events but took no action. What is discernable from the plaintiffs' testimony is that Officers Janik, Sharp, and Sledge arrived shortly after Ms. McNeal and Jamari had been ordered out onto the porch and, thus, were not present

at the time of the encounter of Officers Barroso and Bruno with Mr. McNeal. (Defs. Ex. 5 – Jamari Dep. at 44-46, 49; Defs. Ex. 6 – McNeal Dep. at 46, 55-56; Defs. Ex. 8 – Donetta Dep. at 35, 47-48). Moreover, Officer Janik's testimony is that he arrived on the back porch after Ms. McNeal and Jamari were already standing outside, (Defs. Ex. 2 – Janik Dep. at 23), and that he was not present at the apartment when Mr. McNeal was taken down to the ground and handcuffed. (Defs. Ex. 2 – Janik Dep. at 30). There is no testimony from the plaintiffs that he arrived any earlier than that. Officers Sharp and Sledge arrived slightly later – at around the same time Officer Barroso brought Mr. McNeal back into the apartment for questioning, while Ms. McNeal and Jamari remained handcuffed on the porch. (Defs. Ex. 8 – Donetta Dep. at 47-48; Pls. St. ¶ 21).

While back in the apartment, Mr. McNeal denies making any statements indicating that he was "on papers" or that he kept a gun in the house. (Pls. St. ¶ 24-26; Defs. Ex. 6 – McNeal Dep. at 62-64). Nevertheless, the apartment was searched over a 15-minute time span (Pls. St. ¶ 21); it is conceded that none of the plaintiffs actually observed what went on during the search. (Pls. Rsp. ¶ 35; Defs. Ex. 6 – McNeal Dep. at 60; Defs. Ex. 5 – Jamari Dep. at 55).

At the completion of the search, Mr. McNeal was taken to the police station and charged with felony unlawful use of a weapon. (Defs. Ex. 6 – McNeal Dep. at 66-69; Complaint ¶ 15). Those charges were eventually dismissed on May 28, 2008, (Complaint ¶ 17), and the plaintiffs filed this suit, alleging false arrest/unlawful detention, conspiracy, unlawful search, failure to intervene, failure to provide medical attention for Mr. McNeal's claimed injuries to his head and left knee, and state law claims for intentional infliction of emotional distress, assault and battery, and indemnification.

## II.
## ANALYSIS

In their reply brief, the defendants state that the motion for summary judgment was intended to relate only to Officers Janik, Sharp, and Sledge. (Defs. Reply at 2). Therefore, our analysis addresses solely the issues as they relate to them.[2]

### A.
### The False Arrest Claim

The plaintiffs' first claim alleges that the officers violated their rights under the Fourth Amendment by arresting and detaining them without a warrant or probable cause. While the parties may have dissimilar versions of what transpired in this case, the evidence is undisputed that Officers Bruno and Barroso were the only officers present at the apartment during the events leading to and during the "takedown" and arrest of Mr. McNeal. By the time Officers Janik, Sharp, and Sledge arrived, Mr. McNeal was already in custody, and Donetta and Jamari were already standing out on the porch. (Defs. Ex. 8 – Donetta Dep. at 35, 47-48; Defs. Ex. 2 – Janik Dep. at 23; Pls. Rsp. ¶ 28).

The absence of these three officers from the scene is significant, since redress for alleged constitutional violations under § 1983 is "based on personal liability and predicated upon fault." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). *See also Van den Bosch v. Raemisch,* 658 F.3d 778, 787 (7th Cir. 2011). Hence, the charged individual must have personally "caused or participated in [the] alleged constitutional deprivation." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). *See also Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). This is not to say that

---

[2] The defendants' opening brief did not make this clear and basically collectivized the defendants as though they were fungible. Thus, the analysis in the plaintiffs' response brief was understandably unfocused. It is therefore somewhat unfair for the defendants to argue, as they did in their reply brief, that the plaintiffs focused inordinately on "factual distinctions between the Plaintiffs' version of events and that of Officers Barroso and Bruno…[while] ignor[ing] the fact that Defendants are not seeking summary judgment on behalf of Officers Barroso and Bruno." (Defs. Reply at 2).

an officer needs to have actually physically placed the person under arrest to be liable, but simply that he "under[took] some action prior to, or perhaps at the time of [the arresting officer's] order to arrest…in order to have 'caused' or 'participated' in it." *Jenkins v. Keating*, 147 F.3d 577, 583-84 (7th Cir. 1998).

Although the point isn't elucidated at all in their brief, the plaintiffs' response to the Defendants' Statement of Facts appears to raise an issue as to Officer Janik's role in the detention of the plaintiffs. (Pls. Rsp. ¶ 27). The plaintiffs have not made any argument that Officers Sharp or Sledge were physically present at the scene or that they caused or participated in the alleged misconduct relating to the arrest and detention, so we assume that their lack of involvement at this point of the encounter is conceded. And even if that was not their intent, the argument is nonetheless forfeited. *See Dunn v. Washington County Hosp.*, 429 F.3d 689, 693 (7th Cir. 2005).

In support of their position regarding Officer Janik, the plaintiffs have identified three deposition passages in their response statement, none of which upon examination reflects either that Officer Janik was present during Mr. McNeal's arrest or that he participated in the allegedly improper detention of Ms. McNeal and Jamari. In fact, as we're about to see, the plaintiffs' own testimony confirms that the only officers present during that time were Bruno and Barroso.

The first citation listed is a portion of Damien Stewart's deposition transcript in which he is asked how many "initial" officers were present at the apartment. Stewart replies that, "I can't say a number but it was quite a few. It was quite a few. I can't really say a number, but it was quite a few." When pressed further, all he says is, "I'd say about, probably about two or three. I can't recall a number, but I know it was about two or three." (Defs. Ex. 4 – Stewart Dep. at 23-24).

It is difficult to see how these vague statements could be evidence of anything other than the fact that Stewart simply could not remember how many officers were present, but it was not more than three and perhaps only two. And being present at the apartment is not the same as being present at the time of the encounter with Mr. McNeal, which is the critical time. No other witness testified that there were more than two officers (Bruno and Barroso) present during the takedown and handcuffing of Mr. McNeal. (*See* Defs. Ex. 5 – Jamari Dep. at 39 ("It was two. Two."); Defs. Ex. 6 – McNeal Dep. at 35-36, 39, 50-52; Defs. Ex. 8 – Donetta Dep. at 35, 47-48; Defs. Ex. 2 – Janik Dep. at 23). Mr. Stewart's testimony, which amounts to nothing more than an uncertain estimate of the number of officers at the scene, is insufficient to establish any genuine dispute about whether Officer Janik was present at the time of the arrest of McNeal. "Inferences that are supported only by speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). *See also Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008).

The plaintiffs next cite to a section of Ms. McNeal's deposition, in which she discusses there being a total of four officers who entered the apartment. (Defs. Ex. 8 – Donetta Dep. at 51-52). The time frame being described, however, is "after everything was just about getting ready to be over." (*Id.* at 51). Ms. McNeal's testimony – only a few pages earlier – makes clear Janik, Sharp, and Sledge arrived after Mr. McNeal was handcuffed and after she and her son Jamari had been ordered onto the porch and allegedly handcuffed to one another. (Defs. Ex. 8 – Donetta Dep. at 35, 40, 43 47-48).

The final portion of testimony cited is from Mr. McNeal's deposition, where he describes "two more officers" who arrived at the apartment "a couple minutes after the altercation happened."

11

(Defs. Ex. 6 – McNeal Dep. at 55).  Although his version of what happened skips around a bit, Mr. McNeal is clear that "before the other two detectives came up, [is when] they got Donetta and Jamari to come on out."  (*Id.* at 56).  There is nothing about this testimony that is at odds with any of the other evidence we have already discussed regarding the time Janik, Sharp, or Sledge arrived in relation to when the takedown and handcuffing of Mr. McNeal and the detention of Ms. McNeal and Jamari occurred.

To survive summary judgment, a plaintiff who alleges a violation of §1983 must produce admissible *evidence* that the defendant caused or participated in the charged constitutional deprivation. *Delapaz*, 634 F.3d at 899.  He must "connect the violation to the named defendants." *Caldwell v. City of Elwood*, 959 F.2d 670, 672 (7th Cir. 1992). The evidence in this case fails to establish the necessary link between the actions of Officers Janik, Sharp, and Sledge to the false arrest and detention of the plaintiffs.  Because they were not yet on the scene when Officers Bruno and Barroso took Mr. McNeal into custody and ordered Ms. McNeal and Jamari outside, and there is no evidence that they engaged in (or were even aware of) any misconduct prior to or at that time, *see Jenkins*, 147 F.3d at 587, Officers Janik, Sharp, and Sledge cannot be found personally responsible for the allegedly false arrest and detention of the plaintiffs.  Summary judgment on these claims is therefore granted as to Officers Janik, Sharp, and Sledge.

**B.**
**The Unlawful Search Claim**

**1.**

The plaintiffs next allege that the officers engaged in an illegal search of the apartment, resulting in the recovery of a weapon that Mr. McNeal claims he did not own or know about. (Plaintiffs' Response Brief at 3, 8).  The motion for summary judgment argues that the warrantless

search of the McNeals' apartment was justified by exigent circumstances and the protective sweep doctrine. (Defs. Memorandum at 5; Defs. Reply at 4-5).

The entry of a private home without a warrant constitutes a search and presumptively violates the Fourth Amendment's requirement that searches be reasonable. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *Payton v. New York*, 445 U.S. 573, 585-86 (1980). Nevertheless, a warrantless search is permissible "when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant." *Leaf v. Shellnut*, 400 F.3d 1070, 1081 (7th Cir. 2005). Exigent circumstances may exist, for example, where law enforcement officers are in "hot pursuit" of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42-43 (1976), or where there is a need to "prevent the imminent destruction of evidence." *See Kentucky v. King*, --- U.S. ----, 131 S.Ct. 1849, 1856 (2011).

The defendants argue that the search of the apartment was proper because exigent circumstances existed, requiring the officers to take immediate action by entering the apartment in order to prevent Stewart, whom they believed possessed marijuana, from escaping or destroying the evidence. Although this may well have been true with respect to the officers' initial entry, the defendants' argument ignores the basic factual dispute in the case, which is the plaintiffs' insistence that the officers *re-entered* the apartment after arresting Stewart and walking him outside to the porch. Their brief does not explain what exigent circumstances would have existed to justify the second entry. Indeed, with Stewart already in custody, the officers were no longer in "hot pursuit" and, having recovered marijuana from Stewart's person, there is no indication that there was any

additional marijuana whose destruction was imminent or that the officers could have reasonably concluded that there was.[3]

## 2.

The defendants also contend that their "limited *search for the gun*," (Defs. Memorandum at 6)(emphasis supplied), merely constituted a "protective sweep" of the premises, which is not violative of the Fourth Amendment. After entering a home to make an arrest, officers may, "as a precautionary matter and without probable cause or reasonable suspicion," conduct a visual protective sweep "limited to closets or other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). The officers may look beyond immediately adjoining areas if there are "specific and particular facts which,...reasonably warrant the officer in believing that the area swept *harbored an individual posing a danger to the officers or others.*" *Id.* at 327 (emphasis supplied).

The defendants' concession that the object of the search was the gun is not supportive of their claim that what they did was permissible as a protective sweep, since Mr. McNeal "announced voluntarily that he had [a gun in the apartment]." (Defs. Memorandum at 6). In the first instance, the argument overlooks the fact that Mr. McNeal testified that he never told the officers that he owned a gun. Thus, there is a disputed issue of material fact, and the defendants' argument may not rest on a resolution of that fact favorable to them. Even if believed, however, the defendants fail to

---

[3] In a single sentence that appears in their reply brief, the defendants claim that their warrantless entry was necessary to determine if Stewart had thrown any contraband or drugs into the apartment. (Defs. Reply at 5). The defendants do not explain why this need would have justified a re-entry to the apartment, especially in light of the fact that Stewart was arrested in the kitchen and had not been in any other room of the apartment, the officers recovered drugs from Stewart at the time of the arrest, and there is no evidence that the officers believed that Stewart had possessed more drugs, but that he had thrown them in the apartment somewhere.

explain how the mere fact that there may have been a weapon in the apartment would have, by itself, justified a 15-minute search of the apartment and a seizure of a gun found under a mattress.

The protective sweep doctrine exists principally to protect the lives of law enforcement officers by allowing a limited search to ensure that a "dwelling does not harbor *another person* who is dangerous and who unexpectedly could launch an attack." *Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 627-28 (7th Cir. 2008)(emphasis supplied). Protective sweeps must be "narrowly confined to a cursory visual inspection of *those places* in which *a person* might be hiding," *Buie*, 494 U.S. at 327 (emphasis supplied), and the search in this case was not so limited. The officers recovered the gun from between two mattresses in the McNeals' bedroom, after what Mr. McNeal says was a 15- minute search. It hardly need be said that this is not a place in which the officers could have believed a person might be hiding, waiting to launch an attack. *See United States v. Blue*, 78 F.3d 56 (2d Cir. 1996). Therefore, the officers' search exceeded the scope permitted under the protective sweep doctrine. *See, e.g., United States v. Atchley*, 474 F.3d 840, 850 (6th Cir. 2007) (search of a refrigerator, ice chest, drawer, and ammunition can exceeded the scope of a protective sweep because it was "impossible for an individual to hide within any of those compartments"); *United States v. Fuentes*, 2011 WL 7169215, at *6 (E.D. Tex. 2011)(gun found between some jeans on a self within a closet constituted a search beyond the scope of a protective sweep).

Numerous cases have rejected the argument made here that a search under a mattress qualifies as a protective sweep. In *Blue*, for example, DEA agents in hot pursuit of a suspected crack dealer, tackled the suspect, knocking him through the door and into Blue's apartment. 78 F.3d at 58. Blue, who was not the target of the agents' pursuit, was sitting in on his bed apparently under the influence of narcotics. Agents handcuffed the suspect and Blue, laying them both on the ground

15

with Blue close to the bed. They then conducted a "security sweep" of the one room apartment. One agent proceeded to lift Blue's mattress off of the box spring, where he discovered a wrapped package, machine gun, and ammunition clip.

The government argued the search of the interior of the bed was justified as a protective sweep for a possible third person. Pointing out that the officers lacked articulable facts at the time of the sweep to support such an inference, the Second Circuit rejected their argument, citing the requirement that such searches be limited to "a cursory inspection of those spaces where a person may be found" *Id.* at 60-61. As with the situation in this case, the court noted that the agents had "no information concerning Blue or his apartment prior to their unanticipated entry which would indicate that their safety was threatened by a hidden confederate, let alone one within the confines of the mattress and box spring." *Id.*

Similarly, in *United States v. Ford,* 56 F.3d 265 (D.C. Cir. 1995), the D.C. Circuit held that even though agents were reasonable in their belief that the bedroom could harbor a dangerous individual *and* where a protective sweep revealed a gun-clip, the agents nonetheless went too far in lifting the mattress off of the box spring. *See also United States v. Delancy*, 502 F.3d 1297 (11th Cir. 2007) (lifting of mattress is beyond scope of legitimate protective sweep); *United States v. Pixley*, 7 F.Supp.2d 52 (D.D.C. 1998) (lifting of mattress as part of "protective sweep" incident to execution of arrest warrants was not based on reasonable belief that the area searched harbored a dangerous individual, where defendant's conviction for second degree murder was 14 years old, arrest warrant was for non-violent white collar crime, officers had restrained or determined restraint was unnecessary for all five family members found in residence, and there was insufficient room under bed for person to hide); *Commonwealth v. Norris*, 498 Pa. 308 (1982) (police in an otherwise lawful

16

protective sweep of a bedroom could seize a knife on the night stand but should not have looked under the mattress where they found a gun).

The defendants' arguments are, thus, insufficient to support summary judgment on the unlawful search claim as it pertains to Officers Barroso and Bruno, who according to the reply brief are not moving for summary judgment in any event. However, Officers Janik, Sharp, and Sledge require separate analysis. To that task we now turn.

## C.
### The Unlawful Search and Failure to Intervene Claims
### Against Officers Janik, Sharp and Sledge

The plaintiffs also seek to hold the three officers liable for failing to intervene to prevent the alleged constitutional violations from occurring.

"An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)(emphasis in original). *See also Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). A "realistic opportunity to intervene" might exist, for example, when an officer "could have called for backup, called for help, or at least cautioned [the defendant] to stop." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). The question of whether there was sufficient time to intervene or whether an officer was capable of preventing the harm caused by the other officer "is generally an issue for the trier of fact unless, considering all the evidence, a

17

reasonable jury could not possibly conclude otherwise." *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997).

With respect to the issue of the officers' failure to intervene with the allegedly improper arrests, the defendants advance essentially the same arguments as before – namely, that Officers Janik, Sharp, and Sledge were not present at the scene, and thus had no realistic opportunity to intervene with the arrest of Mr. McNeal or the alleged detention of Ms. McNeal and Jamari. (Defs. Memorandum at 10-11). The plaintiffs' brief counters, by asserting that there is "evidence that additional officers arrived on the porch while Jerome McNeal was beaten and were present when Donetta and Jamari McNeal were ordered out of their home and handcuffed." (Pls. Response at 10). However, the claimed supporting evidence is nowhere referred to in the brief. The conclusion is thus unsupported and must be disregarded. *Bay Area Business Council,* 423 F.3d at 633. It is not the court's responsibility to scour the record in search of evidence to support a party's legal argument. *See Alexander v. City of South Bend*, 433 F.3d 550, 552 (7th Cir. 2006); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003).

At any rate, for reasons which have already been discussed, on this record there is no genuine factual dispute that Officers Janik, Sharp, and Sledge arrived after the altercation with Mr. McNeal and after Ms. McNeal and Jamari were already on the porch. When Janik first arrived on the scene, he learned from Bruno and Barroso that Mr. McNeal was taken into custody for obstructing Officer Bruno's entry to the apartment in order to assist Officer Barroso in detain and arrest Stewart. (Defs. Ex. 2 – Janik Dep. at 24). Officers who do not witness particular conduct may rely on information provided by fellow law enforcement personnel in deciding whether an arrest is proper. *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007)("Having just arrived on the scene,

18

Teipel was entitled to rely on Piatek's statement as to what had already occurred and to make an arrest on that basis"); *see also Spiegel v. Cortese*, 196 F.3d 717, 726 (7th Cir. 1999). Thus, having no reason to believe any constitutional violation had occurred, and since the alleged infraction was over, the officers could not have interceded. And as Mr. McNeal admitted, he did not complain about his alleged injury. Summary judgment is granted in favor of Officers Janik, Sharp, and Sledge on the failure to intervene claim as it relates to the alleged unlawful arrest and detention.

Officer Bruno testified that it was Officer Barroso who went into the bedroom and who conducted the "protective sweep." There is no contrary testimony from the plaintiffs. Nor is there any deposition testimony referred to in the plaintiffs' Rule 56.1 submission on this point. Hence, Officer Bruno's testimony stands unrebutted. No statement of contested or uncontested facts by the plaintiffs refers to the participation by Officers Janik, Sharp, and Sledge in the search.

The motion for summary judgment is granted as to Officers Janik, Sharp, and Sledge on the search and seizure claim and the failure to intervene claim as it applies to the unlawful search claim.

## D.
### The Assault and Battery Claim

In addition to their claims under §1983, the plaintiffs have alleged a state-law claim for assault and battery in connection with Mr. McNeal's arrest. The defendants challenge the claim as it relates to Officers Janik, Sharp, and Sledge, since those officers did not arrive until after the alleged "takedown" occurred and Mr. McNeal had been taken into custody.

Under Illinois law, a battery is defined as the "unauthorized touching of another that offends a reasonable sense of personal dignity." *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008). An assault is simply "conduct which places another in reasonable apprehension of receiving a

battery." *Kijonka v. Seitzinger*, 363 F.3d 645, 647 (7th Cir. 2004) (citing 720 ILCS 5/12-1(a)); *see also Parrish By Bowker v. Donahue*, 110 Ill.App.3d 1081, 1083 (3rd Dist. 1982).

Mr. McNeal alleges that, during the altercation with Bruno and Barroso, he was thrown to the ground and the officers "stomped on his right knee" and struck him on the head with an unknown object. (Pls. St. ¶ 11). Since the claims here would require either "touching" the plaintiff or causing him to feel apprehension of an imminent harmful contact, and since Janik, Sharp, and Sledge were not there during the "takedown" and arrest, it is difficult to see how they could be liable. Perhaps that is why the plaintiffs did not address the assault and battery claim in their brief, and "failure to respond to an argument…results in waiver." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). *See also Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 933 (7th Cir. 2011); *United States v. Vrdolyak*, 593 F.3d 676, 691 (7th Cir. 2010). Summary judgment on this claim is granted with respect to Janik, Sharp, and Sledge.

### E.
### Failure to Provide Medical Attention

The plaintiffs next allege that the defendants failed to provide medical care for Mr. McNeal after the officers allegedly "stomped" on his knee and struck him in the head in the course of arresting him. (*See* Complaint ¶¶ 35-40; Pls. Response at 8-9). In arguing for summary judgment the defendants improperly apply the "deliberate indifference" standard under the Eighth Amendment, which attaches generally when convicted prisoners are challenging the conditions of their confinement. *See Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006); *Hart v. Sheahan*, 396 F.3d 887, 891 (7th Cir. 2005). Where, as here, an arrestee challenges an officer's failure to provide medical care at a time prior to a judicial determination of probable cause, it is the Fourth

20

Amendment's objective reasonableness standard that applies. *Sallenger v. City of Springfield*, 630 F.3d 499, 503 (7th Cir. 2010). "[F]our criteria are examined to determine whether officers responded reasonably to a detainee's need for medical care: (1) the officer's notice of the detainee's need for medical attention; (2) the seriousness of the need; (3) the nature or scope of the required treatment; and (4) any countervailing police interests, e.g., the need to prevent the destruction of evidence, or other similar law-enforcement interest." *Sallenger*, 630 F.3d at 503.

Here, as we have seen in connection with the other claims, Officer Janik, Sharp, and Sledge's absence from the scene at the time of the altercation with Mr. McNeal is significant (although not necessarily determinative in connection with this claim). Because these officers did not witness the incident, they had no way of knowing that Mr. McNeal was injured, unless someone told them or they had observed an injury that a reasonable officer would have thought required medical attention. There is no evidence that either occurred. Although Mr. McNeal testified that he did scream out in pain while either Officer Bruno or Barroso was on top of him, he admitted that he never formally complained of an injury to any of the officers. (Pls. Rsp. ¶ 38). Officers Bruno and Barroso deny that the arrest resulted in any injury that they intended or were aware of at the time, so naturally they wouldn't have told the other officers that McNeal was injured. There is no testimony that either Ms. McNeal or Jamari or Mr. McNeal, himself, notified Officers Janik, Sharp, or Sledge of Mr. McNeal's injuries.

Finally, the plaintiffs do not allege that Mr. McNeal was limping, bleeding, or otherwise physically exhibited any visible signs of injury. How then can there be any basis for liability? "Police must respond to conditions they can observe. ... [They] can act only on appearances...." *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991)(Easterbrook, J., concurring). Officers Janik, Sharp, and

Sledge would have had no way of knowing that Mr. McNeal had been injured, let alone that he was in need of medical attention. It is, of course, a different question entirely for Bruno and Barroso who are accused of *causing* Mr. McNeal's injuries and who were present when he allegedly screamed out in pain. Thus, summary judgment is proper on this claim with regard to Officers Janik, Sharp, and Sledge.

## F.
## The § 1983 Conspiracy Claim

Count II of the complaint charges all of the defendants with having conspired to injure Mr. McNeal by falsely arresting him and then bringing criminal charges against him. It is alleged that part of the conspiracy involved an agreement between all the officers not to report each other after witnessing Mr. McNeal being "abused" and to generate false documentation to cover up their own and each other's misconduct. The three officers on whose behalf the motion for summary judgment is brought contend that there is no evidence to demonstrate that they engaged in any sort of conspiracy. (Defs. Memorandum at 11-12).

A claim for conspiracy under 42 U.S.C. § 1983 applies to defendants acting under color of state law who expressly or tacitly agree to deprive an individual of his constitutional rights. *Williams v. Seniff*, 342 F.3d 744, 785 (7th Cir. 2003). *See also Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010)(discussing the differences between a §1983 and §1985(3) conspiracy); *Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1447-48 (10th Cir. 1990)(same); *Travis v. Keiper-Knapp*, 2011 WL 5395821 *4 (N.D.Ill. 2011). While a conspiracy may be established through circumstantial evidence, the evidence cannot be speculative. *See also Goetzke v. Ferro Corp.*, 280 F.3d 766 (7th Cir. 2002); *Brooks*, *supra*.

22

In their half-page response to this aspect of the motion for summary judgment the plaintiffs posit that "[a] question of fact…exists as to whether the defendants conspired in a 'code of silence' to cover up the misconduct" alleged here. (Pls. Response at 11). The plaintiffs offer no evidence regarding the alleged "code of silence" – a phrase that does not appear in the complaint and is not amplified on in the brief.[4] The sole basis on which the plaintiffs draw an inference of conspiracy is that all of the officers supposedly testified (in their depositions) that Ms. McNeal and Jamari "were never handcuffed and no officers beat, stomped or otherwise abused Jerome McNeal." (Pls. Response at 11).

The argument is unpersuasive. First, the officers were not unanimous in their renditions of the facts. Officers Sharp and Sledge testified that they did not hear the plaintiff say anything about a gun or being on "papers." (Sharp Dep. at 10; Sledge Dep at 18). And they were not present at the altercation and could not and did not testify to what had occurred before they arrived. Officer Janik said he heard the plaintiff make reference to a gun but did not say anything about having heard him say he was on papers/parole. (Janik Dep. at 28). And, although the complaint charges that the defendants fabricated the contents of post-arrest documents, Mr. McNeal's Rule 56.1 submission says nothing at all about any arrest reports or other documentation. Thus, the supposed evidentiary underpinning for the "code of silence conspiracy" argument is not supported by the record in its present form.

---

[4] While there are a number of cases dealing with a supposed "code of silence" in Chicago and other police departments, none are cited in the plaintiffs' briefs. It is not the obligation of the court to research and construct the legal arguments available to parties. *United States v. Alden,* 527 F.3d 653, 664 (7th Cir.2008). Nor should a court to go beyond the briefs. *Fabriko Acquisition Corporation v. Prokos,* 536 F.3d 605, 609 (7th Cir. 2008); *Kay v. Board of Educ. of City of Chicago,* 547 F.3d 736, 738 (7th Cir. 2008); *Hartmann v. Prudential Ins. Co. of America,* 9 F.3d 1207, 1214 (7th Cir. 1993).

Third, the plaintiffs do not cite a single case that would support the conclusion that merely because police officers testify in a way inconsistent with the plaintiff, a reasonable inference of conspiracy can be drawn that is sufficient to defeat a motion for summary judgment. Indeed, if this were the case, then in every §1983 action in which there was a divergence of testimony between the plaintiff and the police – and there always is – there would automatically be a conspiracy claim impervious to summary judgment. Neither *Walker v. Thompson,* 288 F.3d 1005, 1008 (7th Cir. 2002) nor *Admunsen v. Chicago Park Dist.,* 218 F.3d 712, 718 (7th Cir. 2000), on which Mr. McNeal relies, (Pls. Response at 11), supports the result contended for.

At best, these cases do no more than articulate general propositions about conspiracies. But general propositions do not decide concrete cases. *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting). *See also Daubert v. Merrell Dow*, 509 U.S. 579, 598 (1993)(Rehnquist, C.J., concurring in part and dissenting in part)("'general observations'" suffer from the common flaw that they are not applied to the specific matter and "therefore they tend to be not only general, but vague and abstract."); *Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005)(Posner, J.). In *Amundsen*, the court said this:

> In *Kunik v. Racine County, Wisconsin*, we held that in order to sustain a claim that the defendants conspired to deny the plaintiff his constitutional rights, "[t]here must be allegations that the defendants directed themselves toward an unconstitutional action by virtue of a mutual understanding. Even were such allegations to be made, they must further be supported by some factual allegations suggesting a 'meeting of the minds.'" Thus, Amundsen must satisfy the following: (1) allege the existence of an agreement; (2) if the agreement is not overt, "the alleged acts must be sufficient to raise the inference of mutual understanding" ( *i.e.*, the acts performed by the members of a conspiracy "are unlikely to have been undertaken without an agreement"); and (3) "a whiff of the alleged conspirators' assent ... must be apparent in the complaint." Indeed, a conspiracy claim cannot survive summary judgment if the allegations "are vague, conclusionary and include no overt acts reasonably related to the promotion of the alleged conspiracy." 218 F.3d at 718 (citations omitted).

24

The plaintiff's argument cannot be squared with *Amundsen*. It simply cannot be said that it is *unlikely* that two or more defendants can give the same testimony about an event absent a conspiracy to cover up the truth. It is equally plausible that they, and not the plaintiffs, are telling the truth. *Geinosky v. City of Chicago*, --- F.3d ---, 2012 WL 1021141, at *4 (7th Cir.2012) illustrates a situation in which the challenged action is of such a nature that a claim of conspiracy under §1983 should stand. There, the plaintiff's car was constantly ticketed by various officers under circumstances that reflected a deliberate pattern of harassment. The Seventh Circuit said:

> It is a challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy. Under *Twombly,* all plaintiff needed to allege was a plausible account of a conspiracy. See 550 U.S. at 556, 127 S.Ct. 1955. This complaint goes well beyond that. In this regard, the complaint here is fundamentally different from the complaint in *Redd,* which contained "not a whiff of a conspiratorial agreement." 663 F.3d at 292. *Iqbal* calls on us to apply our "judicial experience and common sense." 556 U.S. at ——, 129 S.Ct. at 1950. If several members of the same police unit allegedly acted in the same *inexplicable* way against a plaintiff on *many different occasions,* we will not dismiss a complaint for failure to recite language explicitly linking these factual details to their obvious suggestion of collusion. Geinosky's allegations of a conspiracy among the officers of Unit 253 to harass him by issuing bogus parking tickets and go well beyond the required threshold.

Here, it is not a challenge to imagine a scenario in which the officers could have testified as they did in the absence of a conspiracy. Simply put, the plaintiffs have failed to identify any evidence to support the allegation that Officers Janik, Sledge and Sharp conspired either before or after the events alleged in the complaint. Thus, summary judgment is granted as to them.

**G.**
**The Intentional Infliction of Emotional Distress Claim**

The defendants have also moved for summary judgment on the claim for intentional infliction of emotional distress ("IIED"). Unlike, for example, the assault and battery claim, which was a claim specific to Mr. McNeal, the IIED claim is brought on behalf of all three of the plaintiffs. (Complaint ¶¶ 25-29). The defendants' brief, however, seems to address only Mr. McNeal's claim. Nonetheless, our analysis is not so limited.

To prove this claim, the plaintiffs must establish: (1) that the defendants' conduct was "extreme and outrageous"; (2) that the conduct was intended to inflict severe emotional distress or that the defendants knew there was at least a "high probability" their conduct would inflict such distress; and (3) that their conduct actually caused severe emotional distress. *Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006). To be considered "extreme and outrageous," the conduct alleged "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). This standard is "quite high," *Lewis v. School Dist. # 70*, 523 F.3d 730, 747 (7th Cir. 2008), and does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Honaker*, 256 F.3d at 490.

The plaintiffs' claim fails for a number of reasons. Since Officers Janik, Sharp, and Sledge were not present during the altercation with Mr. McNeal, and the plaintiffs do not identify any conduct these three officers engaged in toward him (or the other plaintiffs) after they arrived that was either "extreme or outrageous," they can't be liable for knowingly and intentionally inflicting emotional distress upon Mr. McNeal (or anyone else). The plaintiffs argue that Mr. McNeal testified

26

that the incident had caused him "emotional distress, anxiety, humiliation, embarrassment of being mistreated and falsely arrested and prosecuted by the Defendants." (Pls. Response at 12). As a result of spending two months in Cook County jail, "living like an animal," Mr. McNeal lost his job, his family could not pay bills, and he missed his son's birthday. (*Id.*). There is no testimony by the other plaintiffs sufficient to show that they suffered severe emotional distress.

Thus, summary judgment on Mr. McNeal's IIED claim for these officers is proper. To the extent the other plaintiffs have properly raised the claim, summary judgment in favor of the three officers is also appropriate.

## H.
## Qualified Immunity

Alternatively, the defendants' brief contends that the officers are entitled to summary judgment on qualified immunity grounds. *Leaf*, 400 F.3d at 1077. It is unclear from the structure of the reply brief – which clarifies that the motion for summary judgment is only brought on behalf of Officers Janik, Sharp, and Sledge – whether qualified immunity is sought only on their behalf or on behalf of all five officers. We shall proceed on the latter assumption.

The doctrine of qualified immunity insulates public officials from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). *See also Messerschmidt v. Millender*, --- U.S. ----, 132 S.Ct. 1235, 1244 (2012)(qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The qualified immunity doctrine exists to balance the interests of "hold[ing] public officials accountable when they exercise power irresponsibly" with the "need to shield officials from harassment, distraction,

27

and liability when they perform their duties reasonably." *Pearso*n, 555 U.S. at 231. Because qualified immunity is "an immunity from suit rather than a mere defense to liability" it is effectively lost if a case is erroneously permitted to go to trial. *Id.* at 231-232. Because the "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery," the Supreme Court has "'repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Id.*

When evaluating a qualified immunity claim, a court must ask whether the "the facts that a plaintiff has alleged...make out a violation of a constitutional right," and if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* Courts are free "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Id.* at 236. *See Van den Bosch,* 658 F.3d at 786. *See also Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011); *Carvajal v. Dominguez*, 542 F.3d (7th Cir. 2008).

The plaintiffs' discussion of the qualified immunity question is to be found in a single, two paragraph page in their supporting memorandum, which concludes that there was no violation of anyone's constitutional rights. (Defs. Memorandum at 14). The reply memorandum is even more laconic, devoting only one conclusory paragraph to the issue. (Defs. Reply at 13). Beyond the briefs' overall skeletal presentation, the opening brief only makes reference to the false arrest claim, ignoring plaintiffs' litany of other constitutional violations. Moreover, the briefs ignore the requirement that the facts be taken in a light most favorable to the plaintiffs, not the defendants. *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012).[5]

_____

[5] In the context of a false arrest claim, the question of qualified immunity turns on whether the arresting
(continued...)

When viewed from that vantage point, there is enough to conclude that there were violations by Officers Barroso and Bruno of clearly established constitutional rights and that their conduct was not objectively reasonable. A more discerning analysis of the facts of the case is required than that in the defendants' briefs, and each alleged constitutional violation – not merely the claim of false arrest – requires separate analysis. Merely because an officer may be entitled to qualified immunity in connection with one violation does not mean that qualified immunity is applicable to all others. *Cf., Leaf,* 400 F.3d at 1078-1079 ("A plaintiff often seeks relief for a single incident on multiple theories of liability. When this occurs, the defendant does not lose his right to appeal the denial of qualified immunity as to one theory of liability even when he still will be required to go to trial on another theory").

There was a time when the legal determination of qualified immunity had to be deferred when there were triable issues of fact on the reasonableness of the police officer's conduct. But that view was abandoned by the Seventh Circuit following *Saucier v. Katz,* 533 U.S. 194 (2001). *See McComas*, 673 F.3d at 725. Thus, "even in cases in which the question of qualified immunity is factually intertwined with the question of whether officers violated the Fourth Amendment..., judges must still make an immunity determination separate from the jury's finding on whether the officers

---

[5](...continued)
officer had "arguable probable cause." *McComas*, 673 F.3d at 725 (citing *Jones* 630 F.3d at 684). "Arguable probable cause exists when a reasonable officer could *mistakenly* have believed that he had probable cause to make the arrest." *Id.* (emphasis supplied). The defendants' argument presumably relies on the same set of facts and argument in the prior section of their memorandum concerning false arrest and unlawful detention. (Defs Memorandum at 3-5). There they argued that the officers had probable cause to arrest Mr. McNeal for obstruction because h blocked Officer Bruno from entering the apartment and helping his partner, Officer Barroso, who had just rushed in in pursuit of Stewart. (Defs.' Mem. at 4). The defendants further alleged that Mr. McNeal refused to cooperate after being ordered to move. (*Id.*). However, these facts are disputed by the plaintiffs, who insist that Stewart was already outside on their porch and in custody when the officers attempted to re-enter their apartment. He also denies he resisted arrest or fought with the officers. *See supra* at 7.

violated the plaintiff's constitutional rights." *Fleming v. Livingston County, Ill.*, --- F.3d ---, 2012 WL 1021179, at *7 (7th Cir. 2012).

Even after the change in the Seventh Circuit's approach to qualified immunity, there are cases that have held that when there are factually intensive questions relating to whether officers employed excessive force, a determination of qualified immunity cannot be made before trial. *See, e.g., Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008). *See also* the pre-*Saucier* case of *Clash v. Beatty*, 77 F.3d 1045 (7th Cir 1996). These cases continue to be cited by district courts. There are admittedly many factual disputes between the parties, but taking the plaintiffs' version of events as true, none are of such a nature as to preclude determining the qualified immunity question now. *See McComas, supra*. Neither party has suggested otherwise.[6]

Since summary judgment is granted in favor of Officers Janik, Sharp, and Sledge, the qualified immunity claim need not be addressed as to them. As to the other officers, their claim of qualified immunity must be rejected.

# I.
## Indemnification Claim

Count VIII of the complaint seeks indemnification presumably against the City of Chicago in the event there is a finding against the officers. The defendants' position in their opening brief is straight forward: since summary judgment must be entered against the plaintiffs on Counts I through VII, it must be entered against the plaintiffs on Count VIII as well. (Defs. Memorandum at 15). That argument is correct as to Officers Janik, Sledge, and Sharp.

---

[6] If this factual assessment is incorrect, summary judgment must still be denied since there are issues that would require a jury's resolution and which are inextricably bound up in a determination of qualified immunity. *See McComas*.

It is not clear whether an indemnification claim can be made when the putative indemnitor is not a party to the case. The plaintiffs' response brief makes no mention of the indemnity claim and neither does the defendants' reply brief. Since this issue has not been raised by the parties, it need not be pursued.

## CONCLUSION

The Motion for Summary Judgment [Dkt # 57] is GRANTED as to Officers Sharp, Janik, and Sledge.

ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

DATE: 4/24/12